1   ANDRÉ BIROTTE JR.
    United States Attorney
2   ROBERT E. DUGDALE
    Assistant United States Attorney
3   Chief, Criminal Division
    WESLEY L. HSU (Cal. Bar No. 188015)
4   Assistant United States Attorney
    Chief, Cyber and Intellectual Property Crimes Section
5   RONALD L. CHENG (Cal. State Bar No. 138892)
    Assistant United States Attorney
6   Cyber and Intellectual Property Crimes Section
        1200 United States Courthouse
7       312 North Spring Street
        Los Angeles, California 90012
8       Telephone:  (213) 894-3493/8644
        Facsimile:  (213) 894-8601
9       e-mail:     mark.krause@usdoj.gov
                    ronald.cheng@usdoj.gov
10
    Attorneys for Plaintiff
11  UNITED STATES OF AMERICA

12                  UNITED STATES DISTRICT COURT

13            FOR THE CENTRAL DISTRICT OF CALIFORNIA

14                      WESTERN DIVISION

15  UNITED STATES OF AMERICA    )  CR 08-1389-MMM
                                )
16            Plaintiff,        )  GOVERNMENT'S SENTENCING POSITION
                                )  FOR DEFENDANT JOON YEOP KIM;
17       v.                     )  MEMORANDUM OF POINTS AND
                                )  AUTHORITIES
18  JOON YEOP KIM,              )
                                )  Date:      May 9, 2011
19            Defendant.        )  Time:      1:15 p.m.
                                )  Courtroom: Roybal 780
20  _____)

21

22

23       Plaintiff, United States of America, by and through its

    counsel of record, Assistant U.S. Attorneys Wesley L. Hsu and
24
    Ronald L. Cheng, submits the government's position regarding the
25
    sentencing of defendant Joon Yeop Kim.
26
    //
27
    //
28

1    This sentencing position is based upon the attached

2  memorandum of points and authorities, the separately filed

3  declaration of Ronald Cheng and attached exhibits (which has been

4  filed as to all defendants in this case), as well as the files

5  and records of this case.

6    DATED: April 18, 2011

7                              Respectfully submitted,

8                              ANDRÉ BIROTTE JR.
                               United States Attorney
9
                               ROBERT E. DUGDALE
10                             Assistant United States Attorney
                               Chief, Criminal Division
11
                               WESLEY L. HSU
12                             Assistant United States Attorney
                               Chief, Cyber & Intellectual
13                             Property Crimes Section

14

15                             RONALD L. CHENG
                               Assistant United States Attorney
16                             Cyber & Intellectual Property
                               Crimes Section
17
                                  Attorneys for Plaintiff
18                                UNITED STATES OF AMERICA

19

20

21

22

23

24

25

26

27

28

ii

# TABLE OF CONTENTS

DESCRIPTION                                                          PAGE

MEMORANDUM OF POINTS AND AUTHORITIES  . . . . . . . . . . . . . 1

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . 1

II.   FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . 2

      A.    Manufacture and Importation of Counterfeit Jewelry  . 2

      B.    The December 28, 2007, Transaction  . . . . . . . . 3

      C.    The February 8, 2008, Transaction . . . . . . . . . 4

      D.    The April 10, 2008, Search  . . . . . . . . . . . . 5

III.  THE GOVERNMENT RECOMMENDS A SENTENCE AT THE LOW END
      OF THE GUIDELINE RANGE . . . . . . . . . . . . . . . . . 7

      A.    Calculation of Infringement Value . . . . . . . . . 8

            1.    Past Sales . . . . . . . . . . . . . . . . . 8

            2.    Goods Seized on April 10, 2008 . . . . . . . 9

            3.    Total Infringement Amount . . . . . . . . . 9

      B.    Role Adjustment . . . . . . . . . . . . . . . . . . 10

      C.    Under the Section 3553(a) Factors, the Government
            Recommends a Low-end Sentence of 41 Months . . . . 10

IV.   RESTITUTION SHOULD BE AWARDED . . . . . . . . . . . . . 14

V.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . 15

iii

TABLE OF AUTHORITIES

DESCRIPTION                                                          PAGE

CASES:

Gall v. United States,
      552 U.S. 38, 128 S. Ct. 586,
      169 L. Ed. 2d 445 (2007) . . . . . . . . . . . 8

United States v. Carty,
      520 F.3d 984 (9th Cir.) (en banc),
      cert. denied, 128 S. Ct. 2491 (2008) . . . . . . . 8

United States v. Futrell,
      209 F.3d 1286 (11th Cir. 2000) . . . . . . . . . 14

United States v. Gossi,
      608 F.3d 574 (9th Cir. 2010) . . . . . . . . . 14

United States v. Lozano,
      490 F.3d 1317 (11th Cir. 2007) . . . . . . . . . 12

United States v. Rivera,
      527 F.3d 891 (9th Cir.),
      cert. denied, 129 S. Ct. 654 (2008) . . . . . . . 12

United States v. Sagendorf,
      445 F.3d 515 (1st Cir. 2006) . . . . . . . . . 12

United States v. Savoie,
      985 F.2d 612 (1st Cir. 1993) . . . . . . . . . 15


STATUTES:

Title 18, United States Code:

      Section 2320 . . . . . . . . . . . . . . . 12

      Section 3553(a) . . . . . . . . . . . . 7, 10, 11

      Section 3663A . . . . . . . . . . . . . . 14


SENTENCING GUIDELINES:

      Section 3B1.1(b) . . . . . . . . . . . . . 10

iv

MEMORANDUM OF POINTS AND AUTHORITIES

I.    INTRODUCTION

Defendant Joon Yeop Kim ("defendant Kim") pleaded guilty to Counts One and Twenty-Eight of the indictment on June 21, 2010. Defendant's sentencing is scheduled for Monday, May 9, 2011, at 1:15 p.m., before this Court.  Defendant's sentencing is scheduled at the same time as codefendants Il Keun Oh ("defendant Il Keun Oh") and Jacqueline Oh ("defendant Jacqueline Oh") (separate sentencing positions are being filed for these defendants, although the substance of each position is the same, given that the offenses arise from the same set of facts).

The government has received the Probation Office's Presentence Investigation Report ("PSR").  Provided that defendant continues to accept responsibility through sentencing, the government concurs with the factual findings and Sentencing Guideline calculations in the PSR, except to note the following corrections:

(1)   in paragraph 22, the goods tested for lead content came from the goods seized in the April 10, 2008, search (not the February 8, 2008, undercover purchase), and

(2)   in paragraphs 29 and 44(d) the sales from March 2007 to January 2008 totalled $790,108.83 (and not $732,684.13), and the total value in paragraphs 44(d) and (g) should be $875,557.44 (and not $818,132.74).

These corrections do not affect the Guideline calculations.

For the reasons below, the government recommends a variance under 18 U.S.C. § 3553(a) for a reduced sentence of 41 months, instead of the recommended term of 51 months.  The Probation Office also did not recommend imposition of restitution, and the

government below states the reasons why restitution in the amount of $700,000, as referenced in the plea agreement, should be made payable to the rightsholders whose trademarks were infringed in this case.  The government also recommends a term of supervised release of three years, and a special assessment of $110.

II.   FACTUAL BACKGROUND

As is set forth in further detail in the plea agreement, the indictment, and the PSR, from February 3, 2007, to April 10, 2008, defendants Il Keun Oh, Jacqueline Oh, and Kim, worked at Elegance Fashion, Mart, Inc. ("Elegance"), located at 124 East Olympic Boulevard, Suites 100, 109, and 401.  Defendants Il Keun Oh and Jacqueline Oh, who were married, owned and operated Elegance.  Defendant Kim was the business manager of Elegance.

A.   Manufacture and Importation of Counterfeit Jewelry

During this time period, defendant Kim, with the knowledge of defendants Il Keun Oh and Jacqueline Oh, ordered costume-type jewelry from O.K. Trading, a company located in Qingdao, in the People's Republic of China ("China") (PSR ¶ 15).  This jewelry included counterfeit jewelry, which bore counterfeit marks that were identical to or substantially indistinguishable from genuine marks in use and registered for use in connection with those goods on the principal register in the United States Patent and Trademark Office ("USPTO"), but in fact were not marks licensed to defendants or Elegance to use on those goods.  Defendants had the counterfeit jewelry packed between packages of jewelry that did not bear USPTO-registered marks, so as to avoid detection by Chinese and U.S. customs authorities.  (Id.).  Defendants also caused the creation and filing with U.S. Customs and Border

2

1   Protection ("CBP") of importation documents that did not mention
2   or describe the counterfeit nature of the counterfeit jewelry.
3   (Id.).

4       At Elegance, defendants maintained lists of counterfeit
5   jewelry that were identified by serial number, which customers
6   could review.  (Declaration of Ronald Cheng separately filed, as
7   to all defendants ("Cheng Decl."), Ex. D (agent's compilation of
8   jewelry codes for counterfeit jewelry)).  Those serial numbers
9   were also used to create sales invoices that were for the sale of
10  counterfeit jewelry and that did not bear the name of Elegance,
11  as opposed to separate invoices that did bear the Elegance name
12  and that were created for the sale of non-counterfeit jewelry.
13  (PSR ¶ 33).  Defendants caused the jewelry, along with generic
14  costume jewelry, to be sold to retailers; for 2007, sales
15  totalled over $4 million (Cheng Decl. Ex. E).  As further
16  discussed below, sales of counterfeit jewelry from March 2007
17  through January 2008 totalled nearly $800,000.  (See infra
18  § II.D).  Further, in February 2008, Chanel brought a civil
19  action in the Western District of Tennessee against Elegance and
20  other defendants for trademark violations.  (PSR ¶ 23).

21      B.   The December 28, 2007, Transaction
22      On December 28, 2007, a confidential informant ("CI") met
23  with an employee named "Cecilia" at Elegance, and the employee
24  took the CI to room 109, where the CI saw hundreds of pieces of
25  counterfeit jewelry, which included pieces with the counterfeited
26  brands Chanel, Juicy Couture, bebe, Hello Kitty, and Tous.  (PSR
27  ¶ 18; Cheng Decl. Ex. A).  The employee said the counterfeit
28  Chanel pieces sold well and that the counterfeit pieces were

3

1    stored in the back room because of the "inspectors." (Id.). The
2    employee took CI to a locked room labelled "109," which contained
3    hundreds of counterfeit jewelry items, and the employee confirmed
4    that everything they were looking at was counterfeit. (Cheng
5    Decl. Ex. A). The CI then purchased a variety of branded items,
6    including bebe, Chanel, and Juicy Couture, for a total of
7    $234.25. (Id.; PSR ¶ 18).

8            C.   The February 8, 2008, Transaction
9            On February 8, 2008, the CI again met with the same employee
10   who assisted the CI on December 28, 2007, and that employee
11   escorted the CI to room 109. (Cheng Decl. Ex. B). During the
12   meeting, which was audio and video-recorded, the employee
13   confirmed to the CI that some of the items had sold out. (Id.).
14   Defendant Jacqueline Oh then joined the meeting. (Id.; PSR ¶
15   19). During the meeting, defendant Jacqueline Oh stated that it
16   was expensive to purchase what was understood to be counterfeit
17   jewelry; on the other hand, those goods could be ordered from
18   overseas for less cost, but that would take a long time. (Cheng
19   Decl. Ex. B).

20           The CI specifically asked how much was the price for which
21   Elegance sold "Van Cleef & Arpels," and defendant Jacqueline Oh
22   replied that Elegance sold a set (meaning earrings and necklace)
23   for $15 to $34. (Id.; PSR ¶ 19). Defendant Jacqueline Oh also
24   stated that they could obtain various types of "Louis Vuitton"
25   for the CI and also stated that Elegance did not carry on hand a
26   large amount of counterfeit jewelry but instead purchased it in
27   small amounts at a time. (Id.). Defendant Jacqueline Oh offered
28   to order what the CI wanted. (Id.). When the CI asked the

1  employee if the CI should call the owner of Elegance to order

2  counterfeit jewelry, the employee said any of the employees could

3  place the order.  (Cheng Decl. Ex. B).  The employee also showed

4  jewelry marked "Tiffany & Co.," "Bvlgari," "Gucci," and "bebe,"

5  and the employee noted that Elegance received the "bebe" jewelry

6  from the importer, which was upstairs.  (Id.).

7       The employee escorted the CI to suite 401, where the CI met

8  employees, including an employee named "Heather," who provided

9  examples of counterfeit jewelry bearing the registered mark of

10 "Chanel" and "Van Cleef & Arpels."  (PSR ¶ 20).  During the

11 conversation, the employee named "Heather" checked a computer for

12 what appeared to be inventory.  (Cheng Decl. Ex. B).  Defendant

13 Jacqueline Oh said that she had been stopped in an airport in

14 China with eight pieces of counterfeit, which Chinese Customs

15 confiscated.  (Id.; PSR ¶ 20).  When the CI asked from where the

16 Chanel watches came, defendant Jacqueline Oh stated she would

17 provide that information later and then said in a lowered voice

18 for the CI to be careful.  (Id.).

19      Defendant Jacqueline Oh sold 43 pieces of counterfeit

20 jewelry to the CI, all of which bore counterfeit marks that were

21 identical to or substantially indistinguishable from genuine

22 marks registered with the USPTO, but in fact were not licensed to

23 defendants or Elegance.  (PSR ¶ 21; Cheng Decl. ¶ 3(c)).

24      D.  The April 10, 2008, Search

25      On April 10, 2008, special agents of the Department of

26 Homeland Security, United States Immigration and Customs

27 Enforcement ("ICE") executed a federal search warrant at the

28 premises of Elegance.  (PSR ¶ 24; Cheng Decl. Ex. C).  The agents

1  seized jewelry that bore counterfeit marks that were identical to
2  or substantially indistinguishable from genuine marks registered
3  with the USPTO, but in fact were not marks licensed to defendants
4  or Elegance to use on those goods.  (Cheng Decl. Ex. G).  The
5  agents also seized approximately $113,430.05 in currency, which
6  has been administratively forfeited.  (Cheng Decl., ¶ 6).

7       Based on items found in the search, agents were able to
8  compile a list of codes for counterfeit jewelry that Elegance
9  caused to be manufactured and sold.  (Cheng Decl. Ex. D).  In
10  addition, law enforcement discovered Elegance monthly sales
11  workbook documents for certain months in which counterfeit goods
12  were separately identified, usually with the legend "CC."  (Cheng
13  Decl.  Ex. H).  Based on those records, past sales of counterfeit
14  were as follows:

15

16

17

18

19

20

21

22

23

24

25

26

27

| MONTH | SALES OF COUNTERFEIT |
|---|---|
| March 2007 (partial from March 14 through 30, 2007) | $29,858.63 |
| April 2007 | $68,311.50 |
| May 2007 | $57,424.70 |
| June 2007 | $67,029.35 |
| July 2007 | $167,406.32 |
| August 2007 | $134,737.26 |
| September 2007 | $65,391.26 |
| October 2007 | $66,481.34 |
| November 2007 | $56,850.31 |
| December 2007 | $40,201.26 |
| January 2008 | $36,416.90 |
| SUBTOTAL | $      790,108.83 |

28       A CBP laboratory tested two of the pieces from the search

warrant (the government had erroneously informed the Probation
Office that these pieces came from the February 8, 2008,
undercover purchase (PSR ¶ 22); in fact, the pieces came from the
search): (1) a pair of stud earrings with a hoop attached to the
stud with back-to-back, interlocking "C"s inside of the hoop with
strands of metal hanging off the bottom of the hoop, and (2)
French hook earrings with the word "Juicy" and a heart hanging
from one hook and the word "Couture" and a heart hanging from the
other hook.  (PSR ¶ 22; Cheng Decl. Ex. F).  The earrings bearing
the words "Juicy" and "Couture" were labelled as being lead-free.
(Id.).  The laboratory determined both of these products that
were tested contained lead without precautionary labeling and
contained a hazardous amount of lead that is accessible for
children to ingest.  (Cheng Decl. Ex. F).

　　　　Near the conclusion of the search, at the time agents were
leaving the office area, defendant Il Keun Oh asked one of the
agents, "Is this about the fakes?"  (PSR ¶ 27; Cheng Decl. Ex.
C).  Agents also discovered that a bag that defendant Kim was
carrying contained company documents depicting counterfeit
"Chanel" jewelry, including a list of photographs of brand-name
jewelry with corresponding codes and invoices for customers that
contained the same codes.  (Id.).

III. <u>THE GOVERNMENT RECOMMENDS A SENTENCE AT THE LOW END OF THE
     GUIDELINE RANGE</u>

　　　　Under Ninth Circuit precedent, district courts initially
determine the Guideline range and then arrive at a reasonable
sentence in light of the factors under the so-called "Section
3553(a) factors" (under 18 U.S.C. § 3553(a)), including:

1           the nature and circumstances of the offense and

2       the history and characteristics of the defendant; the

3       need for the sentence imposed; the kinds of sentences

4       available; the kinds of sentence and the sentencing

5       range established in the Guidelines; any pertinent

6       policy statement issued by the Sentencing Commission;

7       the need to avoid unwarranted sentencing disparities

8       among defendants with similar records who have been

9       found guilty of similar conduct; and the need to

10      provide restitution to any victims.

11 United States v. Carty, 520 F.3d 984, 991 (9th Cir.) (en banc)

12 (citing 18 U.S.C. § 3553(a)(1)-(7) and Gall v. United States, 552

13 U.S. 38, 51, 128 S. Ct. 586, 597, 169 L. Ed. 2d 445 (2007)),

14 cert. denied, 128 S. Ct. 2491 (2008).  The district court is not

15 to presume that the Guideline range is reasonable, but the

16 Guideline factor is to be "respectfully considered" and is one

17 among the § 3553(a) factors to be taken into account in

18 fashioning an appropriate sentence.  Carty, 520 F.3d at 991.  The

19 court must also provide sufficient explanation to permit

20 meaningful appellate review.  Id. at 992-93.

21      A.   Calculation of Infringement Value

22      The government submits that the infringement amount should

23 be $875,557.44, which is the total of the following components:

24           1.   Past Sales

25      For past sales, as described above, law enforcement

26 discovered Elegance monthly sales workbook documents for certain

27 months in which counterfeit goods were separately identified

28 (sometimes with the legend "CC").  (Cheng Decl. Ex. H).  Although

8

1   there could have been an extrapolation from this sample to arrive
2   at a percentage of counterfeit sales to be applied to the
3   entirety of sales, the government instead recommends that
4   infringement value be based only on the identified counterfeit
5   sales for the monthly sales workbook documents that were
6   recovered.  As described in the table above, the records
7   available for the time period March 2007 to January 2008 provide
8   a total of $790,108.83 (the government's submission to the
9   Probation Office erroneously did not include the amount for May
10  2007; the $790,108.83 figure includes that amount).

11            2.   Goods Seized on April 10, 2008

12       For the merchandise seized on April 10, 2008, the
13  infringement value is based upon Elegance's own pricing.  As with
14  the calculation of past sales, this valuation for the seized
15  goods excludes merchandise bearing the name Van Cleef & Arpels.
16  Based on Elegance's own pricing, the infringement amount of the
17  counterfeit goods is $84,993.86.  If the manufacturer's suggested
18  retail price (MSRP) of the trademark holders had been used, the
19  value at the low end would be $3,020,740.51, and the value at the
20  high end would be $7,742,891.43 (excluding the merchandise
21  bearing the name Van Cleef & Arpels; if those goods had been
22  included, the MSRP value at the low end would be $18,848,990.51
23  and the high end would be $23,695,541.43).  (PSR ¶¶ 25-26).

24            3.   Total Infringement Amount

25       The resulting total infringement amount based on Elegance's
26  documented past sales and Elegeance's own pricing, as well as the
27  goods purchased in the undercover purchase on February 8, 2008,
28  is:

                              9

| CATEGORY OF GOODS | INFRINGEMENT AMOUNT |
|---|---|
| Goods purchased in undercover purchase on February 8, 2008 | $454.75 |
| Selected sales March 2007 to January 2008 (including May 2007) | $790,108.83 |
| Goods seized on April 10, 2008 | $84,993.86 |
| TOTAL | $    875,557.44 |

This corrected figure is higher than the infringement amount in the PSR, because the government's submission erroneously did not include the sales figures for May 2007; nevertheless, there is no difference in the offense level.

B.    Role Adjustment

The PSR recommends a role adjustment of three levels. (PSR ¶ 48).  As noted in the PSR, defendants Il Keun Oh and Jacqueline Oh owned the business and directly supervised employees at Elegance.  Aside from defendants, there were 15 people working at Elegance, which is well over the five-person threshold in Guideline Section 3B1.1(b).  (Cheng Decl., ¶ 5).  In addition, defendant Il Keun Oh had in his possession sales lists and had authority over bank accounts.  Accordingly, the government agrees with the recommended role enhancement, although, as discussed below, the government recommends a downward variance under Section 3553(a) equivalent to two offenseslevel.

C.    Under the Section 3553(a) Factors, the Government
      Recommends a Low-end Sentence of 41 Months

The government also submits that under the Section 3553(a) factors, a reduction of one offense level is reasonable, with a

1  recommended sentence equivalent to the low end of the resulting

2  range, or 41months.   Initially, the offense was not an isolated

3  incident in the history of Elegance, but rather was a significant

4  part of its business.   A substantial sentence is necessary to

5  address the "nature and circumstances of the offense," in

6  particular what to date has been an increasing problem with the

7  import of counterfeit trademarked goods from China.   18 U.S.C.

8  § 3553(a)(1).   Defendants not only exploited a direct

9  relationship with a manufacturer in China, but brought in

10  products tainted with lead, presenting a health risk to the

11  consumer market.   The sentence imposed should reflect the

12  seriousness of this offense, promote respect for the law, and

13  provide just punishment.   18 U.S.C. § 3553(a)(2)(A).   A

14  substantial sentence also serves the purposes of deterrence and

15  protection of the public.   18 U.S.C. § 3553(a)(2)(B) and (C).

16       Balanced against these considerations pertaining to the

17  offense and the need for just punishment is the status of

18  defendants as first-time offenders.   The government also

19  recognizes that the recommended term of 51 months is higher than

20  imposed in other recent sentencings involving criminal

21  intellectual property offenses (Cheng Decl., ¶ 5), although this

22  case involves a higher infringement value and a health and safety

23  factor, that is, the lead content in the goods that exceeds

24  safety standards.   Accordingly, the government recommends a

25  variance under Section 3353(a) to 41 months.

26       This term is reasonable.   In a similar setting, the First

27  Circuit affirmed a low-end Guideline sentence of 41 months for

28  trafficking in counterfeit trademarked "Stolichnaya" vodka under

11

18 U.S.C. § 2320. <u>United States v. Sagendorf</u>, 445 F.3d 515 (1st
Cir. 2006). The sentencing court in that case determined that
the conduct was serious, as it was committed over an extended
period with planning and effort with an intended loss of
approximately $300,000. <u>Id.</u> at 518. Declining to "second-guess
the district court's judgment" in that the district court's
explanation was "plausible" and the sentence "defensible," the
First Circuit affirmed. <u>Id.</u>

The same judgment is appropriate here. Defendant's conduct
was "not a crime of momentary weakness or a crime of opportunity,
but a deliberate criminal project." <u>Sagendorf</u>, 445 F.3d at 518
(district court's finding in that case). Moreover, the supply of
the counterfeit product was from overseas. This factor
demonstrates the extent of the criminal conduct, which supports
the sentence imposed. <u>See</u> <u>United States v. Lozano</u>, 490 F.3d
1317, 1325 (11th Cir. 2007) (factor that conduct involved an
"international undertaking" supported reasonableness of
sentence). Defendant did not act alone and the infringing
activity was instead an integral part of the business.

The sentence is also appropriate when weighed against
defendant's background circumstances. In a similar circumstance,
the Ninth Circuit held that a low-end Guideline sentence was
reasonable, in light of the district court's consideration of
factors that included the defendant's absence of criminal history
and family circumstances. <u>United States v. Rivera</u>, 527 F.3d 891,
912 (9th Cir.), <u>cert. denied</u>, 129 S. Ct. 654 (2008). The record
here supports the reasonableness of the sentence that the
government recommends.

Finally, the recommended term will deter others from committing intellectual property crimes, generally, and from importing counterfeit goods, specifically.[1]  This latter point has particularly relevance here in the Central District of California, where, given the enormous volume of inbound goods to the Ports of Los Angeles and Long Beach as well as the international mail facilities at Los Angeles International Airport and LA/Ontario International Airport, importers of counterfeit goods appear to believe that the risk of being caught is minimal.  A sentence of 41 months puts such criminals on notice of the consequences of "playing the odds" that their shipments will not be inspected and seized by CBP.  Moreover, such a sentence, by deterring such importers, helps curb or slow the demand for, and thus the supply of, counterfeit products from countries like China.

Accordingly, based on the nature of the offense, defendant's criminal history, the need for the sentence recommended, the sentence available under the Guidelines, as well as the other Section 3553(a) factors, the government recommends the sentence below.

---

[1]     In fiscal year 2010, Customs and Border Protection seized over $188 million in goods (in domestic value, as opposed to value according to Manufacturer's Suggested Retail Price) due to intellectual property rights violations, with 66% of such goods originating from China and 10% originating from Hong Kong.  See Intellectual Property Rights Seizure Statistics: Fiscal Year 2010, available http://www.cbp.gov/linkhandler/cgov/ trade/priority_trade/ipr/pubs/seizure/seizure_stats_fy2010.ctt/ seizure_stats_fy2010.pdf (last visited April 14, 2011).

13

1    IV.   <u>RESTITUTION SHOULD BE AWARDED</u>

2          In the plea agreement, defendant agreed to make full

3    restitution for the losses caused by his activities.   (Doc. No.

4    70, ¶ 7).   Probation Office declined to include a recommendation

5    for restitution, because the "amount of actual loss has not been

6    established."   (PSR ¶ 129).   Defendants' sales of infringing

7    goods from March 2007 to January 2008, however, were at least

8    $790,108.83.   (PSR ¶ 44(d); <u>supra</u> § II.D).   Defendants

9    acknowledged in the plea agreement that the government contended

10   restitution could be as much as $700,000.   (Doc. No. 70, ¶ 7).

11   At a minimum, defendants should be ordered to pay the

12   rightsholders that $700,000 figure, which is less than the

13   $790,108.83 figure used to calculate infringement value.

14         Under the Mandatory Victims Restitution Act, 18 U.S.C.

15   § 3663A, the focus of restitution is on the victim, not the

16   individual defendant, and is designed to compensate the victim

17   for all "direct and proximate losses" resulting from the

18   defendant's conduct, and not just reasonably foreseeable losses.

19   <u>United States v. Gossi</u>, 608 F.3d 574, 581 (9th Cir. 2010).   It is

20   appropriate to approximate the restitution amount, given that "it

21   is sometimes impossible to determine an exact restitution

22   amount."   <u>United States v. Futrell</u>, 209 F.3d 1286, 1291-92 (11th

23   Cir. 2000).   As the First Circuit stated:

24              The law cannot be blind to the fact that criminals

25         rarely keep detailed records of their lawless dealings,

26         totalling up every column and accounting for every

27         misbegotten dollar.  Hence, the preponderance standard

28         must be applied in a practical, common-sense way.  So

                                    14

1    long as the basis for reasonable approximation is at

2    hand, difficulties in achieving exact measurements will

3    not preclude a trial court from ordering restitution.

4  United States v. Savoie, 985 F.2d 612, 617 (1st Cir. 1993)

5  (quoted in Futrell, 209 F.3d at 1292).

6       Records seized from Elegance did not provide a breakdown of

7  sales by counterfeit mark, but the records did separate

8  counterfeit from non-counterfeit goods.  The absence of more

9  precise records should not preclude the award of restitution, as

10 articulated by the First Circuit in Futrell.  Accordingly, the

11 government requests the Court to award restitution in equal

12 proportion, or $58,333 (for an approximate total of $700,000), to

13 the rightsholders detailed in Appendix A, whose counterfeited

14 marks were sold in this case.

15 V.   CONCLUSION

16      For the reasons stated in this memorandum, should defendant

17 continue to manifest an acceptance of responsibility, the

18 government respectfully requests that the Court impose a sentence

19 of imprisonment of 41 months, supervised release of three years,

20 restitution of $700,000 (in the amount of $58,333 to each of the

21 rightsholders described in Appendix A), and a special assessment

22 of $110.

23      With regard to restitution, the government requests that the

24 Court impose restitution as follows:

25      "It is ordered that the defendant shall pay restitution in

26 the total amount of $700,000.00 pursuant to 18 U.S.C. § 3663A.

27      "The amount of restitution ordered shall be paid as follows:

28 $58,333 to each of the rightsholders described in Appendix A to

15

1  the government's sentencing position.

2      "Restitution shall be due during the period of imprisonment,

3  at the rate of not less than $25 per quarter, and pursuant to the

4  Bureau of Prisons' Inmate Financial Responsibility Program.  If

5  any amount of restitution remains unpaid after release from

6  custody, monthly installments of at least 10% of defendant's

7  gross monthly income, but not less than $500, whichever is

8  greater, shall be made during the period of supervised release,

9  and shall begin 30 days after the commencement of supervision.

10     "The following defendants shall be held jointly and

11  severally liable, for the amount of restitution ordered in this

12  judgment:  Il Keun Oh, Jacqueline Oh, and Joon Yeop Kim.  Each

13  victim's recovery is limited to the amount of its loss and the

14  defendant's liability for restitution ceases if and when the

15  victim receives full restitution."

APPENDIX A

| NAME | WORK ADDRESS/ PHONE |
|------|---------------------|
| Chanel Inc.<br>POC: Adrienne Hahn,<br>Director, Legal<br>Administration | 9 West 57th Street<br>New York, NY 10019<br>O: 212.715.4816 |
| Louis Vuitton Malletier<br>POC: Kenneth C. Klug<br>Director, Criminal<br>Enforcement | 19 East 57th Street<br>New York, NY 10022<br>O: 212.931.2134 |
| Coach Services, Inc.<br>POC: April Pyatt, Manager,<br>Intellectual Property | 516 West 34th Street<br>New York, NY 10001<br>P: 212.631.2690 |
| L.C. Licensing, Inc.<br>POC: Max Luciano<br>Manager of Security Services<br>& Trademark Protection | 1441 Broadway<br>New York, NY 10018<br>O: 201.295.6798 |
| bebe stores, inc.<br>POC: Brad King<br>e-mail: bking@bebe.com | 380 Valley Drive<br>Brisbane, CA 94005 |
| Partecipazioni Bulgari S.P.A.<br>Corporation<br>POC: Dennis Cavanaugh | 555 Fifth Ave<br>17th Floor<br>New York, NY 10017<br>O: 212.856.7210 |
| Tiffany & Company<br>POC: Lawrence Eli Apolzon,<br>Esq. | 866 United Nations Plaza<br>Sixth Floor<br>New York, NY 10017<br>O: 212.813.5921 |
| Sanrio Company Ltd.<br>POC: J. Andrew Coombs, A.P.C. | 517 East Wilson Ave.<br>Suite 202<br>Glendale, CA 91206<br>O: 818.500.3200 |
| S. Tous S.L.<br>POC: David Sunshine | 250 Park Avenue<br>Suite 1000<br>New York, NY 10177<br>O: 212.986.1116 |

17

| NAME | WORK ADDRESS/ PHONE |
|---|---|
| Phat Fashions LLC<br>POC: Nicole E. Kaplan, Esq. | 410 Park Avenue<br>New York, NY 10022<br>O: 212.326.0417 |
| Playboy Enterprises<br>International, Inc.<br>POC: Mary Ball<br>Associate Director, IP<br>Enforcement | 680 N. Lake Shore Drive<br>Chicago, IL 60611<br>O: 312.373.2315 |
| Heidi Klum<br>POC: Sarah Hsia | O: 212.210.9400<br>E-mail:<br>Sarah.Hsia@alston.com |